#### IN THE UNITED STATES DISTRICT COURT FOR THE
#### NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **WANDA S. HARPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 11-CV-201-PJC |
| | ) | |
| **MICHAEL J. ASTRUE,** Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION AND ORDER

Claimant, Wanda S. Harper ("Harper"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Harper appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Harper was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the October 26, 2009 hearing before the ALJ, Harper was 45 years old, and she had received a GED. (R. 31-32). According to her testimony, she had earned certifications in heavy equipment, in industrial facilities maintenance and as a nurse's aide, but all her certifications had expired. (R. 32-33). Harper testified that she had not worked since February 2008. (R. 33). In

February 2008, Harper left her work as a laborer in order to assist her pregnant daughter. *Id.* Harper testified that she had planned to return to work until she received a toe injury caused by her ex-husband running over her leg with a motor vehicle. (R. 33-34). This injury became infected, which resulted in amputation of the toe. *Id.*

Harper described her diabetes, and asserted that her blood sugar level was around 400 or 500 when she tested it each day, even though she took medication as prescribed. (R. 35). The disease caused her feet and legs to swell every day and caused blurriness in her vision. (R. 34-35, 44). In order to alleviate the pain from the swelling, she spent significant time in her recliner with her feet elevated. (R. 35). Harper testified that she experienced pain and swelling in her shoulders and hands, and doctors had told her that she had arthritis in her hands and knees. (R. 35-36). She dropped things often, including personal items and food. (R. 41). Harper explained that shooting pains and numbness in her foot, which she attributed to being run over, made it difficult to walk. (R. 36-37). Although she testified that herniated discs in her back would have warranted surgery, she decided against an operation because the doctor predicted a fifty percent likelihood that she would not walk afterward. (R. 37). She estimated that she slept around six hours a day, but she estimated that she slept only three hours at night. (R. 41-42).

Harper's testimony included a description of psychological and mental problems. She said that she was being treated for depression. (R. 43-44). There were days when she did not want to leave the house. (R. 43). She had crying spells, and she felt nervous and upset around people. (R. 43-44). Her mental condition affected her concentration. She would forget things or burn food on the stove. (R. 44-45).

Harper testified that she could stand in one spot for 25-45 minutes. (R. 38-39). She could alternate between sitting and standing for around 3 hours before she would have to lie down because her feet would hurt and swell. *Id.* She could walk several blocks. *Id.* She could do work such as cleaning for 10-15 minutes. *Id.* Sustained activity like cleaning or yard work would cause her feet to swell and her hands to cramp. (R. 39).

Harper testified to limitations in her ability to perform everyday tasks. While at the grocery store, Harper rode a motorized chair. (R. 42-43). She stayed home six out of seven days. (R. 43). She said that she mainly cooked using a microwave, and that her son or brother helped her with housework like mowing the lawn, sweeping, and mopping the floors. (R. 42-43).

Harper admitted that she spent three years in prison for DUI and possession of a controlled substance. (R. 45-46).

Harper was seen for back pain at the Tulsa Urban Clinic on May 17, 2007. (R. 228). She received refill prescriptions for Vicodin, Flexeril, Claritin, as well as prescriptions for Ativan[1] and Glipizide[2] and other medications that are not legible. *Id.* She was seen again at the Tulsa Urban Clinic for back pain on July 23, 2007. (R. 227). The purpose of the visit was for low back pain, lumbar strain, and anxiety. *Id.* On November 9, 2007, Harper returned to the clinic, and received prescriptions to refill her medications. (R. 226). On December 18, 2007 she was seen again at the clinic seeking treatment for low back pain and degenerative disc disease. (R. 225). She received refill prescriptions for Flexeril, Lorazepam[3] and other medications. *Id.* On

---

[1] Ativan provides short-term relief from symptoms of anxiety disorders. *www.pdr.net*

[2] Glipizide is used to improve glycemic control for type II diabetics. *www.pdr.net*

[3] Lorazepam provides short-term relief from symptoms of anxiety disorders. *www.pdr.net*

January 29, 2008, she returned to the clinic to be treated for back pain. (R. 224). Harper received refill prescriptions for Metformin,[4] Flexeril, Glipizide, Ativan, and Actos.[5] On April 4, 2008, she returned to the clinic. (R. 223). The purpose of the visit was chronic low back pain, muscle spasms, and knee pain, and Harper received refill prescriptions. *Id.*

On May 5, 2008, Harper was seen by Gregory R. Pittman, M.D. (R. 191). The patient history indicates that Harper said that her left foot had been run over by a truck three weeks before. *Id.* She had been seen at the OSU Medical Center, where an x-ray revealed a possible fracture to the left great toe. *Id.* Dr. Pittman obtained a tissue sample from Harper's left foot, which he sent for a microscopic examination. (R. 237). He found that the fourth toe of the left foot showed gangrenous necrosis with suppuration.[6] (R. 230). On June 12, 2008, Dr. Pittman amputated the toe. (R. 231).

The records of the public health nurse with the Indian Healthcare Resource Center indicated that on June 18, 2008, Harper received a new glucometer and was instructed on how to use it. (R. 279). On July 31, 2008, Harper received an x-ray because she complained of pain to her left big toe. (R. 276-78, 286). The x-ray found no fracture, but did indicate small soft tissue calcifications and osteopenic bony structures. *Id.*

On August 22 and September 26, 2009, Harper returned to the Tulsa Urban Clinic to follow up on her foot and back problems, and she also received refill medications. (R. 274-75).

---

[4] Metformin is used to improve glycemic control for type II diabetics. *www.pdr.net*

[5] Actos is used to improve glycemic control for type II diabetics. *www.pdr.net*

[6] Suppuration is "[t]he process of pus formation." Taber's Cyclopedic Medical Dictionary 1870 (17th ed. 1993).

On September 1, 2009, Harper saw Jeffrey Cates, D.O., with Family & Children's Services. (R. 301-02). Dr. Cates diagnosed Harper on Axis I[7] with chronic major depressive disorder and generalized anxiety disorder. (R. 301). He gave her a Global Assessment of Functioning ("GAF") score of 49.[8] (R. 302). He prescribed new medications to her (Cymbalta and Ambien) and planned for follow-up. *Id.* On October 14, 2009, Harper saw Elka Serrano, M.D, who adjusted her medications. (R. 305).

Agency consultant Joel Justin Hopper, D.O., completed a consultative examination on August 4, 2008. (R. 241-42). Dr. Hopper noted that Harper ambulated with a slow speed, but she could move "all extremities well," could perform fine tactile manipulation of objects, had a full range of motion in her spine, and could move about the exam room easily. (R. 242). Dr. Hopper's assessment found that Harper had left foot pain post toe amputation, chronic lower back pain with a history of herniated and degenerated discs, diabetes, osteoarthritis, and depression. *Id.*

---

[7] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[8] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

Harper underwent a second consultative examination with Dr. Hopper on February 16, 2009. (R. 290-98). At that time, Dr. Hopper observed that Harper ambulated with a stable gait at an appropriate speed, without the use of assistive devices. (R. 293). His assessment reported that Harper had diabetes, toe amputation to the left foot and left foot pain due to the amputation, herniated L4-5 intervertebral disc, chronic lower back pain, depression, and anxiety. *Id.*

Luther Woodcock, M.D., an agency non-examining consultant, completed a Physical Residual Functional Capacity Assessment on August 20, 2008. (R. 266-73). Dr. Woodcock determined that Harper could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (R. 267). She could sit or stand for 6 hours of an 8 hour work day. *Id*. For narrative explanation, Dr. Woodcock referred to the amputation of Harper's fourth left toe. *Id.* He noted that Harper had zero cardiopulmonary deficits. *Id.* He wrote that she had a history of herniated disc. *Id.* Dr. Woodcock found that Harper's grip and strength capacity functioned with a score of five out of five and that she had full use of her hands and fingers. *Id.* He found that her condition would not last for twelve consecutive months. *Id*. He noted that her treating physician had advised that she could "return to normal activities." *Id.*

Agency consultant Michael D. Morgan, Psy.D., evaluated Harper on August 15, 2008. (R. 247-50). Dr. Morgan reviewed Harper's history, and reported that Harper had signs and symptoms consistent with an adjustment disorder with depressed mood. (R. 250). Dr. Morgan reported that Harper performed necessary household tasks, that she displayed logical and coherent communication, and that she displayed the abilities to concentrate and to exercise good judgment. (R. 247-49). Dr. Morgan's diagnosis on Axis I was adjustment disorder with depressed mood, alcohol dependence in sustained partial remission, and cannabis dependence with sustained full remission. (R. 250). Dr. Morgan assigned Harper a GAF score of 61-65. *Id.*

6

Non-examining agency consultant, Dorothy Millican-Wynn, Ph.D., completed a Psychiatric Review Technique form on August 19, 2008. (R. 252-65). Dr. Millican-Wynn checked boxes indicating that Harper's impairment was nonsevere. (R. 252). For Listing 12.04, Dr. Millican-Wynn noted Harper's symptoms of depressive syndrome included sleep disturbances, decreased energy, and a depressed mood. (R. 255). For the "Paragraph B Criteria,"[9] Dr. Millican-Wynn found that there were no restrictions of activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 262). In the "Consultant's Notes" portion of the form, Dr. Millican-Wynn briefly reviewed Harper's mental health history, including that she had never received inpatient or outpatient mental health care in a hospital, but that she did take medications prescribed by her physician. (R. 264). Dr. Millican-Wynn noted that Harper had no difficulties performing personal hygiene tasks and that she socialized with and cared for her family. *Id.* She could leave the home unassisted. *Id.* Dr. Millican-Wynn summarized Harper's condition as having "no functional restrictions or limitations due to any mental condition." *Id.*

---

[9] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

**Procedural History**

Harper filed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits, 42 U.S.C. §§ 401 *et seq.* (R. 100-09). Harper alleged onset of disability as April 13, 2008. (R. 100). The applications were denied initially and on reconsideration. (R. 55-62, 68-73). A hearing before ALJ Charles Headrick was held on October 26, 2009 in Tulsa, Oklahoma. (R. 27-50). By decision dated January 12, 2010, the ALJ found that Harper was not disabled. (R. 13-26). On January 29, 2009, the Appeals Council denied review of the ALJ's findings. (R. 11-12). Thus, the decision of the ALJ represents a final decision in this case for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[10] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[10] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four,

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Harper's date last insured was September 30, 2011. (R. 16). At Step One, the ALJ found that Harper had not engaged in substantial gainful activity since her alleged onset date of April 13, 2008. (R. 18). At Step Two, the ALJ found that Harper's diabetes and the amputation of her fourth left toe were severe impairments. *Id.* The ALJ found that there was

---

where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

insufficient evidence to show a severe mental impairment. (R. 18-20). At Step Three, the ALJ found that Harper's impairments did not meet any Listing. (R. 20).

The ALJ determined that Harper had the RFC to perform the full range of light work. (R. 20). At Step Four, the ALJ found that she could perform her past relevant work as a short order cook. (R. 24). In the alternative, at Step Five, the ALJ found that, given Harper's age, education, work experience, and RFC, there were jobs existing in the national economy in significant numbers that Harper could perform. (R. 24-25). Thus, the ALJ found that Harper was not disabled from April 13, 2008 through the date of the decision. (R. 25).

## Review

Harper argues that the ALJ's decision should be reversed due to deprivation of her procedural due process rights, failure to include all impairments in the Step Four and Step Five analysis, failure to properly consider all medical evidence, and error in the credibility assessment. Regarding the arguments raised by Harper in her briefs, the undersigned finds that there was substantial evidence in the record supporting the decision of the ALJ, and the ALJ's decision complies with the legal requirements. Therefore, this case is affirmed.

**Procedural Due Process**

Harper asserts that documents relied on in Dr. Morgan's consultative examination were left out of the record, which prevented the Appeals Council from giving the case a meaningful review. The authorities cited by Harper require a "serious risk" that there was a "miscarriage of justice" in order to justify reversal when the government provides an "incomplete transcript." Plaintiff's Opening Brief, Dkt. #15, p. 3; *Ortiz-Salas v. I.N.S.*, 992 F.2d 105, 106 (7th Cir. 1993). In *Witjaksono v. Holder*, 573 F.3d 968, 973-74 (10th Cir. 2009), cited by Harper, the Tenth Circuit reversed the decision of an immigration judge because the government failed to "prepare

a reasonably complete and accurate transcript" when the transcript was 57 pages long and contained approximately 189 notations of "(Indiscernible)."

The undersigned is not convinced that the cases cited by Harper give a standard that is applicable to a Social Security disability case; however, even under that standard, Harper's argument is not persuasive. Harper's complaint relates to Dr. Morgan's consultative report. Plaintiff's Opening Brief, Dkt. #15, p. 4. Dr. Morgan stated the following in a section of his report called "Sources of Information":

> This report represents an integration of information from the following sources: an interview with the claimant and documentation furnished by the State of Oklahoma Disability Determination Division including medical records. Also included were records from the Oklahoma State Courts Network (OSCN) and the Oklahoma Department of Corrections (ODOC). The above sources of information appear to be reliable.

(R. 247).

There were no documents from OSCN and ODOC in the administrative transcript, and Harper argues that the omission of the documents referred to by Dr. Morgan constitutes a violation of her right to procedural due process, because "obviously, objective medical evidence was missing, and was not provided to Claimant." Plaintiff's Opening Brief, Dkt. #15, p. 4. Harper fails to show how criminal records are "objective medical evidence" or how the inclusion of the criminal records could possibly have made an impact on the outcome of this case. Harper's argument is merely a declaration that certain documents were excluded and a conclusory statement that she "would have a much better opportunity to obtain a reversal on appellate review if the record were complete." *Id*. Without more explanation as to how Harper was prejudiced by the administrative transcript's lack of these documents, Harper's argument is unpersuasive. *Holdsworth v. Chater*, 87 F.3d 1327, at *5 (10th Cir. 1997) (unpublished)

(rejecting a procedural due process argument in a Social Security disability case, because the claimant's argument "does little to inform us of the alleged errors or of any prejudice" to the claimant).

**Error at Steps Four and Five**

Harper's arguments regarding Steps Four and Five are scattered and disjointed. This section of her brief is less than two pages long, and each sentence or two appears to be making a distinct, but undeveloped, argument. Plaintiff's Opening Brief, Dkt. #15, pp. 5- 6. For example, Harper begins this section by stating that the ALJ did not include all of her impairments at Step Four and Five. *Id*. at 5. She mentions the ALJ's finding that Harper could perform past relevant work. She then references testimony from the vocational expert ("VE") listing alternative light and sedentary jobs. *Id*. Harper writes that the ALJ failed by not properly analyzing the effects of her depression, and then she references the need for the hypothetical to "be precise and contain all the limitations of record." *Id*. Harper complains that "the ALJ failed to include any limitation due to lower back impairment." *Id*. The second paragraph of this section of the argument returns to the subject of the hypothetical and the effect of Harper's "mental impairment." *Id*. at 6. These portions of Harper's brief appear to be attempting to articulate at least three different arguments: one asserting the ALJ's failure to properly analyze Harper's depression, a second regarding the hypothetical given to the VE, and a third concerning the effects of Harper's back pain. The lack of development and lack of a transition between the arguments makes any meaningful analysis by this reviewing Court difficult.

In *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009), the court discussed an argument related to the claimant's RFC. *Id*. The Tenth Circuit noted that at the district court level, the

claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence. *Id*. The appellate court stated that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived." *Id*. The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue. *Id*. (quotation and citation omitted). Here, the undersigned finds that Harper's arguments in the section of her brief related to Steps Four and Five are perfunctory and undeveloped to the point that this Court cannot give them meaningful review, and therefore, pursuant to *Wall*, a finding that these arguments have been waived is appropriate.

Even absent a finding of waiver, the Court would conclude that the ALJ's decision is adequate on these points. The ALJ's decision included a thorough discussion of Harper's depression and its effects on her ability to work. At Step Two, the ALJ found that "the claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (R. 18). The ALJ went on to spend a page and a half discussing the basis for that finding. (R. 18-20). Then, in his RFC analysis, the ALJ reiterated his discussion of Harper's symptoms, diagnosis, and treatment of depression. (R. 22). The ALJ's discussion shows that the ALJ found no functional limitations from Harper's nonsevere mental impairment. *Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished) (rejecting claimant's argument that the ALJ had omitted limitations in the RFC determination that resulted from nonsevere mental impairments); *Dray v. Astrue*, 353 Fed. Appx. 147, 150-51 (10th Cir. 2009) (unpublished) (evidence of mild mental impairments did not contradict ALJ's RFC

determination omitting any limitations related to mental impairments). It is clear from the ALJ's decision that "throughout the disability process" he considered the effect of Harper's alleged mental impairment. 20 C.F.R. § 404.1523; *Langley v. Barnhart*, 373 F.3d 1116, 1223-24 (10th Cir. 2004).

Harper accuses the ALJ of not including "any limitation due to lower back impairment in his hypothetical or in the decisional RFC." Plaintiff's Opening Brief, Dkt. #15, p. 5. The RFC, however, did include a limitation to light work, which recognized that Harper did not have the capacity to lift more than 20 pounds on an occasional basis or more than 10 pounds on a frequent basis, and therefore the RFC did include some accommodations to Harper's physical limitations. *See White v. Barnhart*, 287 F.3d 903 (10th Cir. 2001) (ALJ's RFC limiting claimant to light work was supported by substantial evidence, in spite of claimant's subjective complaints of low back pain). The ALJ fully discussed Harper's subjective complaints of back pain and gave his reasons for not finding those complaints fully credible. (R. 20-24). He discussed the lack of medical evidence to support Harper's allegations of back pain, as well as the affirmative evidence provided by both of Dr. Hopper's examinations, which found that Harper had a "full range of motion in her spine." (R. 22-23). The ALJ's finding that Harper was not limited by lower back issues, other than by a limit to light work, was an acceptable finding, supported by substantial evidence. *See Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004) (medical evidence regarding injury to claimant's knee did not contradict ALJ's finding that she could still perform light work).

In this section of Harper's brief, she includes several sentences that attempt to make arguments regarding the hypothetical questions to the VE. Plaintiff's Opening Brief, Dkt. #15, pp. 5-6. These arguments are not persuasive, because "the ALJ's hypothetical included all of the

limitations he properly determined claimant to have." *Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th Cir. 2000). To reiterate, the Court finds that Harper's arguments related to Steps Four and Five are waived due to insufficient development. *Wall*, 561 F.3d at 1066-67. The ALJ's RFC determination, together with his findings at Steps Four and Five, were supported by substantial evidence, and therefore those findings are affirmed.

**Medical Source Evidence**

Harper next argues that the ALJ failed to properly consider the medical source evidence by failing to cite the GAF of 49 which Dr. Cates assigned to Harper, and failing to properly weigh Dr. Cates' opinion against the consultative opinion of Dr. Morgan, who gave Harper a GAF score of 61-65. Plaintiff's Opening Brief, Dkt. #15, pp. 6-7. Harper argues that because the ALJ specifically mentioned the GAF score that Dr. Morgan gave Harper, then the ALJ should have also mentioned the GAF score given by Dr. Cates. *Id*. While it would have been preferable for the ALJ to specifically discuss the GAF score given by Dr. Cates, this is not a case in which the ALJ failed to acknowledge the psychiatric treatment altogether. The ALJ did cite to the records of Family & Children's Services, noting that Harper had been prescribed Cymbalta for depression and anxiety, and Ambien for poor sleep. (R. 19). Thus, the ALJ included the records of Harper's brief treatment by Family & Children's Services in his consideration of the evidence.

In a recent case with facts similar to those of Harper's case, the Tenth Circuit rejected an argument that the ALJ had erred by failing to mention GAF scores assigned by treating physicians. *Butler v. Astrue*, 412 Fed. Appx. 144, 145-47 (10th Cir. 2011) (unpublished). In *Butler*, mental health counselors assigned GAF scores ranging from 44 to 46, while a consultative examiner gave the claimant a GAF of 70. The Tenth Circuit affirmed the ALJ's

15

decision, finding that the ALJ had considered all of the evidence, even though he had not specifically included the lower GAF scores in his discussion. *Id.* In Harper's case, the Court adopts the reasoning of the Tenth Circuit in *Butler* and finds that the ALJ's failure to explicitly include the GAF score of 49 was not fatal to his decision.

Harper argues that the ALJ erred by stating that Harper was not assigned any "alternate prescriptions" after she stopped taking Cymbalta and Ambien, when in fact she was prescribed Remeron. Plaintiff's Opening Brief, Dkt. #15, pp. 7-8. The ALJ appears to have been mistaken in this portion of his opinion, but Harper fails to show any possible prejudice from this inaccuracy. This "minor error" does not "undermine confidence" in the ALJ's decision. *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993); *Talamantes v. Astrue,* 370 Fed. Appx. 955, 959 (10th Cir. 2010) (unpublished); *Ramsey v. Barnhart*, 117 Fed. Appx. 638, 640 (10th Cir. 2004) (unpublished); *Whitney v. Barnhart*, 60 Fed. Appx. 266, 268 n.1 (10th Cir. 2003) (unpublished).

**Credibility Determination**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White*, 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ found that Harper's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[11] (R. 22). The ALJ proceeded to give several specific reasons for his credibility finding. *Id*. Regarding Harper's alleged back pain, he noted that even though Harper complained of back pain, she was only treated by medication. She never had radiological tests, she had never been referred to a specialist, and she never was treated with physical therapy. *Id*. The ALJ pointed out that, while Harper said her back injury related to an accident in 1996, she had continued working until her alleged onset date of April 13, 2008. (R. 23-24). The ALJ went on to consider Harper's alleged foot pain. (R. 23). He pointed out that in her last follow-up visit with Dr. Pittman she had "no complaints," and Dr. Pittman had stated that Harper could resume normal activities. *Id*. Finally, the ALJ highlighted the inconsistencies between Harper's testimony and the observations of Dr. Hopper, including her ability to move all extremities well and the full range of motion in her spine. (R. 23-24).

Much of Harper's argument that the ALJ performed an improper credibility analysis consists of asserting undeveloped arguments and listing pieces of evidence that the ALJ chose not to include in his analysis. Plaintiff's Opening Brief, Dkt. #15, pp. 8-10. These arguments are waived for lack of development. *Wall*, 561 F.3d at 1066.

Harper includes one sentence stating that the ALJ was required to state which portions of Harper's testimony he accepted as true or rejected as untrue, citing *Hayden v. Barnhart*, 374 F.3d

---

[11] Harper faulted this language as meaningless boilerplate, but this sentence was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

986, 992 (10th Cir. 2004). Plaintiff's Opening Brief, Dkt. #12, p. 5. This "rule" appears nowhere in *Hayden*, which instead appears to reject such an argument. *Hayden*, 374 F.3d at 992. In *Hayden*, the court reversed, in part because it found that the ALJ's credibility assessment was flawed for many reasons, but the court appeared to use reasonable inferences based on the RFC assessment to determine what parts of the testimony the ALJ found credible. *Id.* For example, the court stated that the ALJ "obviously found [the claimant's] testimony that she could not lift more than ten pounds and could not stand or walk more than a few hours/day to be credible, as he assessed her RFC to be for only sedentary work." *Id.* Similarly, it is clear in the present case that the ALJ rejected Harper's statements that were inconsistent with the RFC determination that Harper could perform light work. (R. 20-24). That meant, for example, that he rejected any testimony of Harper that she could not occasionally lift or carry 20 pounds, or frequently lift or carry 10 pounds. This Court rejects Harper's argument regarding a supposed requirement that the ALJ specify the portions of the claimant's testimony he accepts or rejects.

Harper asserts positive factors that she says the ALJ should have mentioned, but did not. Plaintiff's Opening Brief, Dkt. #15, pp 8-10. Harper says that her complaints were consistent. Harper cried at the hearing and was described as "very tearful" during a teleclaim. None of Harper's physicians said that she could work full time, and none of them reported that she exaggerated her symptoms. Harper took medications for her pain, including narcotics. *Id.* A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence." *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished). The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment "was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion." *Id.* at 686. The Tenth Circuit found no

reason to overturn the ALJ's credibility determination.  *Id.*  This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Harper was not fully credible.  *See also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require discussion).

Harper argues that the ALJ mischaracterized the evidence when he wrote that Harper "changed her testimony" regarding how long she could sit and that the mischaracterization was material to the question of whether the ALJ's credibility assessment was supported by substantial evidence.  Plaintiff's Opening Brief, Dkt. #15, p. 9.  It is not clear that the ALJ did mischaracterize Harper's testimony.  The ALJ asked Harper how long she could stand.  (R. 38).  At first, she said that she could stand for an hour, but when the ALJ rephrased the question and asked whether Harper could work at a job that would require her to stand in one spot for an hour, Harper said that she could only stand "in one spot" for 25-30 minutes.  (R. 38-39).  Harper never tried to explain why she differentiated between "standing" and standing "in one spot," or why she had said that she could stand for an hour, but, when the ALJ mentioned standing at a job, she said she could only stand for 25-30 minutes.  A reasonable mind could have identified this as a change in her testimony, and therefore there was no mischaracterization of the evidence.

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard.  'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'"  *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011), *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 6th day of July 2012.

Paul J. Cleary
United States Magistrate Judge